UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA<br><br>v.<br><br>JEREMY DAVID HANSON,<br>Defendant | Crim. Nos. | 3:22-CR-030013-MGM;<br>3:22-CR-30038-MGM |
|---|---|---|

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Jeremy David Hanson, respectfully submits this sentencing memorandum in support of her motion for a variance and her recommendation of a sentence of time served. Mr. Hanson concurs with the Government's request that any period of incarceration be followed by three years of supervised release, a $100 special assessment, and no fine or restitution. Conditions should be imposed which address his mental health and developmental disability needs.

### ARGUMENT

As we all know, March 2020 was a surreal and singular moment in the living memory of most people in this country. Like all of us, Mr. Hanson, was thrown into a world of extreme isolation and sudden retraction of social and community interaction. It was a difficult time for even the most well-adjusted and emotionally stable amongst us, but it was cataclysmic for people already struggling with mental health and developmental issues. People with various

developmental and mental health diagnoses often had associated physical health characteristics which made them more susceptible to serious illness and death than most people. On top of this anxiety-provoking reality, was the complete shutdown of all community-based programming and mental health treatment that had supported people with these diagnoses and their caretakers.[1]

Jeremy Hanson is a member of this group of people thrown into this maelstrom of increased risk and diminished support. Jeremy struggled with emotional and behavioral issues throughout his childhood and was diagnosed with Autism Spectrum Disorder (then referred to as Asperger's Syndrome) and obsessive compulsive disorder when he was fifteen years old.[2] As Jeremy moved into young adulthood, his emotional difficulties mounted. By the time he was 19-years old, Jeremy had given up driving due to anxiety and panic attacks, leaving him even more dependent on his mother. But Jeremy is an intelligent and curious person and was ultimately able to graduate from high school in 2007 and then college in May 2015. (See Attachment A – California State University Long Beach Diploma), albeit with a great deal of support from his mother.

By 2015, another factor that exacerbated Jeremy's issues was reaching a

---

[1] https://www.frontiersin.org/articles/10.3389/fpsyt.2020.561882/full
[2] The clinician who evaluated Mr. Hanson when he was fifteen found that he was "borderline" for an ASD diagnosis and he was formally diagnosed with Autism Spectrum Disorder when he was 22.

fever pitch – the unchecked proliferation of conspiracy theories and misinformation on social media and fringe news websites, such as Facebook, Twitter, 4chan, 8chan, and Reddit, among others. Like many others, Jeremy's anxiety in social situations and preference for introverted pursuits led him to spend ever increasing amounts of time on the internet. Unlike most people, who are neurotypical, traits associated with Jeremy's ASD and OCD led him to engage with this problematic material on the internet in very unhealthy ways. Jeremy's behavior was consistent with recent research opining that the combination of rigidity of thinking and a tendency to engage in the collection of large amounts of information (both are autistic traits) with a weakness in a person's "ability to critically and scientifically assess the validity of the information" correlates to a higher prevalence of conspiratorial beliefs. See Georgiou, Neophytos, *Conspiracy Theory Beliefs, Scientific Reasoning and the Analytical Thinking Paradox,* Appl. Cognit. Psychol. 2021; 35:1523-1534 (2021). For Jeremy, this culminated in an escalation of conduct that has caused alarm and pain for people on the receiving end of these threats, and tragic, life-altering consequences for him personally.

As concerning as this conduct was, there is a great deal of evidence that this Court may consider to assure itself that Jeremy, with help, can correct this behavior. Since his diagnosis in 2003, Jeremy has been treated and evaluated

by numerous psychological and psychiatric experts. When he has had access to and engaged in appropriate treatment and programming, the problematic conduct has been mitigated and his general wellbeing and functioning in the community has improved. His mother, Lauren Zack, is a retired licensed social worker and has maintained meticulous records of his treatment and progress over the years. Jeremy's conduct first escalated to the point of making threats, triggering a cautionary visit from the FBI in July 2015. Significantly, this time period coincides with Jeremy's graduation from college, which ended a significant external source of routine and healthy social engagement. When the conduct came to light, Ms. Zack acted quickly to seek out further treatment and evaluation for Jeremy. In a letter to counsel, Ms. Zack described this period and the bumpy, but gradually improving course that followed:

> In July of 2015 I was contacted by the FBI secondary to Jeremy's online behavior. Jeremy was getting into online arguments over politics. He made no effort to hide his identity and was easily tracked. When confronted, Jeremy admitted this behavior and expressed suicidal intent. Although Jeremy is not religious, he identifies strongly as being culturally Jewish; he told me he was defending the State of Israel against what he perceived as "anti-Semitic threats." He said since he could not be in the IDF (Israeli Defense Force) because "I'm a loser with a bad brain", he would defend the country in the only way he knew how, by Internet postings and emails. Jeremy was voluntarily admitted to UC Irvine Health Center for a psychiatric evaluation and was deemed to not be a credible danger to himself or others. Jeremy was discharged home to me, with medication changes. He agreed to have his computer taken away from him and had no Internet access for approximately 9 months. The FBI did not press charges.
>
> For the next 4 years, Jeremy experienced a lot of mental and emotional instability. He was seen by different psychiatric practitioners and was

taken on and off different psychiatric medications, each time experiencing severe side effects from withdrawal. In 2019, Jeremy had another change in medication, and this time it helped him have a gradual stabilization of mood.

Jeremy has always had difficulty expressing his emotions during traditional "talk therapy". However, in 2019 he began Equine Therapy, attending every two to three weeks. This form of therapy involves Jeremy interacting with a horse at a stable. Jeremy has always had a good rapport with animals, and they are attracted to his gentleness with them. While he helped groom, bathe, and walk the horse, Jeremy was able to interact with the therapist and began to talk about his emotions, still a difficult task for him.

By the end of 2019 Jeremy's mood and behavior had improved to the point that he and I were discussing the possibility of his receiving services from the State Department of Rehabilitation, a program providing job training and placement services for disabled adults; we made it a goal for 2020.

But in May of 2020, coinciding with Covid lockdown and the sudden cessation of treatment options, Jeremy came under investigation by the FBI again. His mother explains,, "[u]nfortunately, in 2020 the Covid 19 pandemic started, and Jeremy's Equine therapy was discontinued for many months. Jeremy regressed emotionally and mentally with the inability to attend therapy, or go out to eat or to the movies, both recreational activities he highly enjoyed with me. During Covid lockdown, Jeremy spent most of his time in his room on his computer and cell phone." Unbeknownst to Ms. Zack, Jeremy had fallen even deeper down a toxic rabbit hole of conspiracy theories and misinformation and had resumed the threatening conduct.

The Government appropriately recognizes Mr. Hanson's mental health and

developmental diagnoses as a mitigating factor. This is welcome and appreciated, however, the eighteen months recommended by the government is not only greater than necessary to achieve the purposes of sentencing, sentencing Mr. Hanson to additional incarceration threatens to exacerbate the mental health and emotional issues and make his road to independence and appropriate social and emotional expression even more arduous, and, potentially, less successful. (See Zack letter).

It is imperative that Mr. Hanson transition, as soon as possible, out of the dehumanizing isolation that marks his present circumstance of incarceration into a rigorous program of therapy with practitioners who have expertise dealing with people with ASD. Jeremy needs therapy to help him work on his rigid thinking, engage him in pro-social programming and activities in the community, and work to foster independent living and decreased reliance on his mother. Mr. Hanson is very lucky that his mother, Lauren Zack, is a retired licensed social worker, who has been working very hard during this period to ensure that appropriate programming and treatment options are in place for Jeremy as soon as he is released from custody. (See Zack letter, RCOC Documents). While he has been incarcerated, Ms. Zack has ensured that Mr. Hanson's file with the Regional Center of Orange County has remained open and she is actively engaged with that program to make sure that Jeremy will be

able to move quickly into programming upon his release. (See RCOC Documents).

## Guideline Objections

*The Charged Conduct Did Not Involve Multiple Threats to Any Single Victim*

The charged conduct in indictment No. 22-CR-30013 does not involve multiple threats and therefore does not warrant a two-level upward adjustment. Only one of the four communications associated with Docket No. 22-CR-30013-1 in the PSR contain a threat. The first three communications are protected speech that are not rendered unprotected by the final communication. While the prior communications do provide evidence to support a finding that Mr. Hanson should have reasonably foreseen that the final communication would be taken as a threat, they do not constitute multiple threats. This is consistent with the indictment to which Mr. Hanson pled, which only alleges the communication in ¶23 as a threat.

*The Enhancement Specified in USSG §3A1.1(a) Should Not be Applied*

The enhancement pursuant to U.S.S.G. §3A1.1 should not be applied to either indictment. As an initial matter, the Court should limit its analysis of this enhancement to the conduct charged in the indictments to which Mr. Hanson pleaded guilty. Regarding Docket No. 22-CR-30013, the recipient of the threat was not an identifiable person, group of people, or even a business or

organization representing people with the protected attributes listed in §3A1.1(a). Rather, Mr. Hanson sent Merriam-Webster the offensive communications because, in its role as a business, it made a decision to expand the definition of the word "female" – a decision with which Mr. Hanson disagreed. Similarly, the recipient of the threat in Docket No. 22-CR-30038, was the president of a university in Texas who had criticized a campus group for sponsoring a speaking event at the school with a controversial right-wing political candidate, thereby "oppress[ing] conservatives." The recipient of the email is not known to be a person with any of the protected attributes listed in §3A1.1(a).[3]

To be sure, all of the communications display hateful rhetoric, slurs, and opprobrium of many groups of people, including, Marxists, Democrats, leftists, and, yes, transgender people. But the targets of these communications were selected because they were either an institution or the representative of an institution with a role to play in preserving social and cultural norms as Mr. Hanson understood them and he saw them as failing to carry out that role in their official actions.

One does not have to agree with or condone Mr. Hanson's views about any of the groups he mentions in his communications or the terms he uses to

express his outrage to make the distinction that is legally required here. Mr. Hanson did not, beyond a reasonable doubt, select these recipients because he believed or knew they were people with the attributes listed in §3A1.1(a) or because they organizationally or institutionally advocated for or were comprised of individuals or groups of people with those attributes.[4]

In light of the arguments above, the adjusted offense level (subtotal) for Groups 1 and 2 should be 12. The multiple count adjustment should be changed to reflect the adjusted offense level of 12 for both groups with a resulting combined adjusted offense level of 14.[5] After a reduction in levels for acceptance of responsibility, the Total Offense Level should be 12 and the guideline imprisonment range should be 10 months to 16 months.

## Conclusion

Without a doubt, Mr. Hanson's threats were couched in offensive and graphically violent terms and were surely incredibly scary and disturbing to the people who were either the direct recipients or required by their employment to interact with them. However, multiple mental health providers have assessed

---

[4] Contrary to the government's argument, this reading of §3A1.1(a) would not limit its application to only instances where the victims are minorities. To use the government's example, Goodwin and Schwerner were surely personally targeted because of their race by white supremacists who resented that they advocated from their position of privilege as white men.

[5] In light of the arguments above, §3E1.1(b) is inapplicable.

Mr. Hanson over the years and determined that he lacks the capacity to carry out these threats and strongly urge continued, consistent treatment with providers who specialize in working with people with Autism. After years of COVID-related reductions in services, these treatment options are becoming more and more available again. It is crucial that Mr. Hanson transition as quickly as possible from an carceral setting, which is ill-equipped to meet his needs and address his rehabilitation, to the proven, community-based treatment programs which have demonstrably helped him in the past.

Respectfully Submitted,
Jeremy David Hanson, DEFENDANT,
By his attorney,

/s/Marissa Elkins
Marissa Elkins, Esquire, BBO#668840
31 Trumbull Rd. Suite B
Northampton, MA 01060
melkins@elkinslawllc.com
(413) 341-2131

Certificate of Service
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 17, 2023.

/s/Marissa Elkins